IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


ALLEGHENY ENERGY SUPPLY COMPANY,
LLC, and MONONGAHELA POWER CO.,

        Plaintiffs,

v.                      //   CIVIL ACTION NO. 1:05CV04
                               (Judge Keeley)

ELIOT SPITZER, in his
official capacity as Attorney
General of the State of New
York, RICHARD BLUMENTHAL, in
his official capacity as
Attorney General of the State
of Connecticut, and PETER
HARVEY, in his official
capacity as Attorney General
of the State of New Jersey.


        Defendants.


MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS (DKT. NO. 41)


Pending before the Court is the motion of the defendants (collectively, "the AGs") to dismiss the amended complaint of the plaintiffs, Allegheny Energy Supply Company, LLC, and Monongahela Power Co. (collectively, "Allegheny"). Because the plaintiffs fail to establish a prima facie case of specific jurisdiction, the Court **GRANTS** the motion (dkt. 41) and **DISMISSES** this case **WITHOUT PREJUDICE.**

**MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS**

## I. FACTUAL BACKGROUND

The plaintiffs are energy companies.[1] Allegheny Energy Supply
Company, LLC, is a Delaware limited liability corporation with its
principal place of business in Pennsylvania. Monongahela Power Co.
is an Ohio corporation with its principal place of business in West
Virginia. They are subsidiaries of Allegheny Energy, Inc., which
owns coal-fired power plants in West Virginia and Pennsylvania. To
fuel these coal-burning plants, Allegheny burns approximately 13
million tons of coal per year.

The Clean Air Act ("CAA"), 42 U.S.C § 7401 et. seq., regulates
existing sources of air pollution such as the plants owned by
Allegheny. The CAA also regulates new sources of air pollution or
existing sources that are modified.[2] New sources or modified

---

[1]    Unless otherwise noted, the Court draws all facts from
Allegheny's first amended complaint. Dkt. 31-1.

[2]    42 U.S.C. § 7411(a)(4) defines "modification" as "any
physical change in, or change in the method of operation of, a
stationary source which increases the amount of any air pollutant
emitted by such source or which results in the emission of any air
pollutant not previously emitted." In U.S. v. Duke Energy Corp.,
411 F.3d 539 (4th Cir. 2005), the Fourth Circuit Court of Appeals
held that "only a project that increases a plant's hourly rate of
emissions constitutes a 'modification.'" On certiorari, however,
the Supreme Court vacated and reversed, holding that the Fourth
Circuit's interpretation of the CAA did not comport with applicable
standards of statutory interpretation, and that CAA's definitional
section specifies no rate at all, hourly or annual, but merely
requires a "'physical change in or change in the method of

existing sources must meet technology-based emission control standards and apply for preconstruction permits. The technology-based standards, the New Source Permitting Standards ("NSPS"), "ensure newly constructed sources incorporate advanced systems of emission control as part of their design." Dkt. 31-1, ¶ 27.

The preconstruction permitting requirement for new and modified sources, the New Source Review ("NSR"), requires those intending to build a new, stationary source of pollution, or to modify an existing one, to apply for and receive a permit before beginning construction. Id. at ¶ 30.  A "major modification" that would trigger an NSR includes "any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase of a regulated NSR pollutant and a significant net emissions increase of that pollutant from the major stationary source." 40 C.F.R. 51.166(b)(2)(I).

Between 1983 and 2001, Allegheny "undertook necessary maintenance, repair or replacement projects," dkt. 31-1, ¶ 33, at some of its coal-fired power plants in West Virginia and

---

operation of a major stationary source that would result in a significant net emissions increase of any' regulated pollutant." Environmental Defense v. Duke Energy Corp., 549 U.S. 561, 577 (2007)(quoting 40 CFR § 51.166(b)(2)(I)).

## MEMORANDUM OPINION AND ORDER GRANTING THE
## DEFENDANTS' MOTION TO DISMISS

Pennsylvania "to assure safe, reliable and efficient plant operation as required by many state laws." Id. On September 15, 1999, then New York Attorney General Spitzer sent Allegheny a notice of intent (NOI) to sue under the CAA citizen suit provision.[3] The NOI alleged that Allegheny had violated the CAA by making major modifications to its Fort Martin plant in Maidsville, West Virginia, without obtaining a NSR pre-construction permit. Approximately five years later, on May 20, 2004, the AGs sent Allegheny a second NOI charging Allegheny with a similar failure to follow NSR standards and alleging unpermitted, major modifications at the following plants:

- Albright plant, Albright, West Virginia

- Fort Martin plant, Maidsville, West Virginia

- Harrison plant, Haywood, West Virginia

---

[3]     The AGs explain that Allegheny's failure to comply with the CAA caused acid rain in the AGs' states, thus drawing their attention to plants located in West Virginia and Pennsylvania. Acid rain, however, is not a component of the AGs' forecasted claim. Rather, they have sued Allegheny under the CAA citizen suit provision, 42 U.S.C. 7604(a)(3), which provides that "any person may commence a civil action on his own behalf . . . against any person who proposes to construct or constructs any new or modified major emitting facility without a permit . . . or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit."

**MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS**

- Pleasants plant, Willow Island, West Virginia

- Willow Island plant, Willow Island, West Virginia

- Armstrong plant, Adrian, Pennsylvania

- Hatfields Ferry plant, Masontown, Pennsylvania

- Mitchell plant, Courtney, Pennsylvania.

The State of West Virginia, through the West Virginia Department of Environmental Protection (the "WV DEP"), administers the NSR program within West Virginia pursuant to regulations developed by West Virginia and approved by the EPA as part of the Clean Air Act State Implementation Plan ("SIP"). Likewise, Pennsylvania administers the NSR program within its borders. Neither West Virginia nor Pennsylvania identified any of the projects named in the NOIs as a project that might trigger the NSR. Nor did those states find that any of the projects increased the hourly rate of pollution emission at the plants.

## II. **PROCEDURAL HISTORY**

After Allegheny filed its complaint for declaratory judgment, the AGs moved to dismiss the complaint and the parties filed a joint motion to stay discovery and defer the scheduling process. Allegheny then amended its complaint, following which, pursuant to Fed.R.Civ.P. 12(b)(1), (2) and (6), the AGs moved to dismiss

**MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS**

Allegheny's first amended complaint. That motion is fully briefed and ripe for review.

In its amended complaint Allegheny alleges that, through the initiation of a civil action under an unlawful interpretation of the CAA, the AGs seek to impose restrictions and costs on the operation and maintenance of certain Allegheny-owned power plants in West Virginia and Pennsylvania. It alleges that the AGs want to impose CAA standards that are inapplicable to their power plants and that allegedly would threaten Allegheny's ability to provide safe, efficient and reliable power to West Virginians.

In their motion to dismiss Allegheny's complaint the AGs argue that:

(1) this Court lacks personal jurisdiction over them;

(2) they are immune from Allegheny's claims under the Eleventh Amendment to the United States Constitution;

(3) Allegheny's claims are not justiciable because Allegheny lacks standing and its claims are not ripe;

(4) Allegheny fails to state a claim for which injunctive relief may be granted (Claim III); or

(5) This Court should exercise its discretion to dismiss the declaratory judgment causes of action because they were filed for improper reasons.

## MEMORANDUM OPINION AND ORDER GRANTING THE
## DEFENDANTS' MOTION TO DISMISS

Allegheny's response to the motion to dismiss argues that the AGs originated and maintained contacts with the plaintiffs in West Virginia that are sufficient to establish personal jurisdiction here. Allegheny also asserts that its claims are justiciable because the AGs filed suit against Allegheny in Pennsylvania to resolve the parties' disputed interpretations of the Clean Air Act ("CAA") and New Source Review ("NSR"). Allegheny further argues that the Pennsylvania AGs' suit establishes that a ripe controversy exists between the parties, and that the Eleventh Amendment does not bar its suit because the AGs waived their Eleventh Amendment immunity by issuing a Notice of Intent ("NOI") to sue Allegheny and filing suit against it in Pennsylvania. Allegheny also invokes the Ex Parte Young exception to Eleventh Amendment immunity because it seeks prospective relief to end alleged ongoing violation of federal law by the AGs. Finally, Allegheny claims that venue in this Court is proper under 42 U.S.C. § 7604(a)(3), and that the AGs have offered no reason supporting their argument that the Court should exercise its discretion and dismiss Allegheny's claims for declaratory and injunctive relief.

MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS

### III.   DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 12

## A. Case or Controversy, Rule 12(b)(1)

The AGs assert that this Court lacks subject matter jurisdiction over Allegheny's complaint because Allegheny has failed to establish a case or controversy under Article III of the Constitution. Allegheny's complaint, however, does state a case or controversy suitable for declaratory and injunctive relief. See 28 U.S.C. § 2201. On June 28, 2005, the AGs brought suit against Allegheny in the United States District Court for the Western District of Pennsylvania, Civil Action No. 05-885 (the "Pennsylvania Action"), for the same NSR violations at Allegheny's Pennsylvania plants as alleged in the 2004 NOI. Dkt. 31-1, 4. Should Allegheny lose the Pennsylvania action, the rights asserted in its complaint in West Virginia will be adversely affected. The Pennsylvania Action, therefore, threatens Allegheny with an "actual or imminent" injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Consequently, the controversy before the Court is "definite and concrete, touching the real legal relations of the parties having adverse legal interests." Aetna Life Ins. Co. V. Haworth, 300 U.S. 227, 240-241 (1937). Therefore, Allegheny presents a case or controversy and has standing before this Court.

See <u>Nashville, C. & St. L. Ry. v. Wallace</u>, 288 U.S. 249, 264 (1933)(holding that federal courts may adjudicate various forms of suit, including declaratory judgments, "so long as the case retains the essentials of an adversary proceeding, involving a real, not a hypothetical, controversy.").

## B. <u>Personal Jurisdiction, Rule 12(b)(2)</u>

"Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law." <u>Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners</u>, 229 F.3d 448, 450 (4th Cir. 2000). Therefore, in order for a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.</u> 334 F.3d 390, 396 (4th Cir. 2003).

West Virginia's long arm statute authorizes West Virginia courts to exercise jurisdiction over foreign defendants to the limits of due process. W.Va. Code § 56-3-33; <u>Harman v. Pauley</u>, 522 F.Supp. 1130, 1135 (S.D.W.Va. 1981). The statutory and constitutional "jurisdictional requirements collapse into a single

inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Christian Science Bd. of Directors of First Church of Christ</u>, 259 F.3d 209, 215 (4th Cir. 2001) (internal citations omitted).

Because neither side suggests that the activities of the AGs subject them to general jurisdiction, <u>see</u> <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408 (1984), the personal jurisdiction inquiry here is limited to specific jurisdiction. <u>ALS Scan, Inc. v. Digital Service Consultants, Inc.</u>, 293 F.3d 707, 711 (4th Cir. 2002)(noting that personal jurisdiction is based on either general or specific jurisdiction). Where the contacts of the defendant with the forum state serve as the basis for the suit, those contacts may support specific jurisdiction. <u>Id.</u>

To determine if the West Virginia contacts of the AGs support the exercise of specific jurisdiction in this case, the Court must consider "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" <u>Carefirst</u>, 334 F.3d at 397. Each element must be present to support

specific jurisdiction. <u>Id.</u> Therefore, the AGs may be held to specific jurisdiction in West Virginia only if (1) they purposely availed themselves of conducting activities in West Virginia; (2) Allegheny's claims arise out of those activities; and (3) the exercise of personal jurisdiction would be constitutionally reasonable. <u>Id.</u>  At bottom, this inquiry focuses on "the quality and nature of [the AGs'] contacts." <u>Id.</u> (internal citations omitted).

Allegheny bears the burden of establishing personal jurisdiction over the AGs. <u>See id.</u> at 396. Its burden of showing personal jurisdiction on a motion to dismiss is light:

> When, however, as here, 'a district court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction.' In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff.

<u>Id.</u> (Internal citations omitted). "This, however, does not mean that a court must adopt the plaintiff's legal conclusions that the alleged facts meet jurisdictional requirements; it is the province of the court to determine whether, as a matter of law, personal jurisdiction exists." <u>Williams v. Advertising Sex LLC</u>, Civil Action No. 1:05CV51, 2009 WL 723168, at *2 (N.D.W.Va. March 17, 2009).

11

MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS

## 1. **Allegheny Fails to Establish Purposeful Availment**

Allegheny argues that the AGs purposefully availed themselves of the privilege of conducting activities in West Virginia in four ways. First, it claims that, through their 1999 and 2004 NOIs, the AGs sought to regulate Allegheny's West Virginia activities. Second, it asserts the NOIs are a higher quality contact than other business letters because they "create a cloud of uncertainty" around Allegheny and are a prerequisite to a CAA citizen suit. Third, it argues that the series of NOI-precipitated settlement meetings between Allegheny and the AGs in 2004 and 2005 are additional contacts the Court should consider. Finally, Allegheny contends the Court has jurisdiction to hear this case because the CAA citizen suit provision of 42 U.S.C. § 7604(c)(1) requires that any suit brought by the AGs challenging activities at the West Virginia plants be brought in the district in which those plants are located.

### a. **Regulation of Allegheny's West Virginia Activities**

Contrary to Allegheny's assertions, the AGs seek not to regulate Allegheny's West Virginia activities but rather to enforce its compliance with federal law. In Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 954 F.2d 1174,

12

1175 (6th Cir. 1992), a coalition of Michigan producers of radioactive waste sought to enjoin state officials in Nevada, Washington, and South Carolina from keeping Michigan radioactive waste out of their states because the waste did not comply with the Low-Level Radioactive Waste Policy Amendment Acts of 1985. The Sixth Circuit held that, because the state officials had sought to comply with federal law rather than purposefully to avail themselves of the benefits and protections of Michigan law, they were not subject to jurisdiction in Michigan. Id. at 1177 (noting that the "district court misconstrued the defendants' compliance with federal law as purposeful action.").

Like the state officials in Michigan Coalition, the AGs here seek to enforce compliance with federal law. See Her Majesty the Queen in Right of the Province of Ontario v. The City of Detroit, 874 F.2d 332, 335 (6th Cir. 1989) ("If a state implementation plan ("SIP") is approved by the EPA, its requirements become federal law and are fully enforceable in federal court."); dkt. 31-2, 5; dkt. 31-3, 6 (statement by AGs in both 2004 and 1999 NOIs that they "will commence an action against the companies in federal court pursuant to 42 U.S.C. § 7604(a)(3)."). By notifying Allegheny of the possibility of an action under the CAA's citizen-suit provision, the AGs sought to compel compliance with NSR pre-

construction permitting requirements rather than take advantage of the "benefits and protections" of West Virginia law. <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476 (1985). <u>See</u> <u>Natural Resources Defense Council, Inc. v. Train</u>, 510 F.2d 692, 699-700 (D.C. Cir. 1974) (noting that the CAA citizen suit provision "reflects Congress's recognition that '(c)itizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike'")(internal citations omitted). By threatening a CAA citizen suit against Allegheny, therefore, the AGs neither sought to enforce nor otherwise take advantage of West Virginia laws.

### b. <u>NOIs</u>

In 1999, then Attorney General Spitzer sent a NOI to Allegheny's Hagerstown, Maryland office, premised on alleged violations at the Fort Martin, West Virginia plant. Following the 1999 NOI, however, neither Spitzer nor Allegheny filed suit regarding the Fort Martin plant. After a five-year gap, the AGs sent Allegheny a second, expanded NOI alleging violations at eight of Allegheny's plants in West Virginia and Pennsylvania. They mailed that NOI to Allegheny's corporate headquarters in Fairmont, West Virginia, as well as to Allegheny's offices in Maryland and

Pennsylvania.[4] Following the 2004 NOI, the parties met in New York four times to discuss settlement of their differences. See dkt. 43-2; 48-4.

In support of its jurisdictional argument, Allegheny relies on American Greetings Corporation v. Cohn, 839 F.2d 1164 (6th Cir. 1988), for the proposition that the two NOIs and ensuing four meetings in New York establish the necessary minimum contacts by the AGs with West Virginia. In American Greetings, however, the Sixth Circuit found the exercise of personal jurisdiction over a non-resident defendant to be proper where "the defendant sent numerous letters, made numerous phone calls, and appointed local agents who pursued his claims with the plaintiff." Calphalon Corp. v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000) (distinguishing the importance placed on the threat of litigation in American Greetings from circumstances in which a non-resident defendant sent only one letter to the plaintiff outlining his potential claims).

Here, the AGs sent two letters to Allegheny separated by five years. These letters were sent to Allegheny's offices not only in

---

[4]     The 1999 NOI was addressed to Allegheny's Maryland office and carbon-copied to recipients in Washington, D.C., Pennsylvania, and West Virginia. Dkt. 31-2. The 2004 NOI that was addressed to Allegheny in West Virginia also was addressed to corporate offices in Pennsylvania and Maryland. Dkt. 31-3.

**MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS**

West Virginia but also in two other jurisdictions. Moreover, the settlement meetings precipitated by the NOIs occurred in New York, not West Virginia, the forum state. Finally, the AGs did not retain a "local agent," nor did they retain a West Virginia attorney until after Allegheny filed its complaint with this Court.

Allegheny argues the NOIs are of such weight and quality that their quantity is of no consequence. The CAA requires potential citizen suit plaintiffs such as the AGs in this case to give notice of a potential action to EPA administrators, alleged violators, and regulatory agencies of states in which the alleged violation occurs. 42 U.S.C. § 7604(b). In light of this requirement, Allegheny argues that the NOIs "demonstrate the AGs' intention to seek injunctive relief, penalties, and mitigation of harm allegedly caused by the emissions of [Allegheny's] West Virginia plants," and therefore are different from other business correspondence. Dkt. 48 (internal citations omitted).

Two factual considerations cut against this conclusion. First, the AGs did not sue Allegheny following the 1999 NOI. Based on its prior experience with the AGs, Allegheny could reasonably have expected that the AGs would not file suit following the 2004 NOI. Second, "the purpose of the [CAA citizen suit] notice provision is to allow the [EPA] Administrator and other officials to rectify

inaction, and thus obviate the need for judicial recourse." <u>Friends of the Earth v. Potomac Elec. Power Co.</u>, 546 F.Supp. 1357, 1361 (D.C. Cir. 1982). Therefore, although it is true that the NOI is a statutory prerequisite to filing a CAA citizen suit, based on Allegheny's own experience with the AGs as well as judicial interpretation of the NOI requirement, it is also true that a NOI does not inexorably lead to a lawsuit. As such, the NOI is more readily compared to the letter examined in <u>Calphalon</u> that the Sixth Circuit found insufficient to support personal jurisdiction. 228 F.3d at 723.

Allegheny further argues that although the NOIs were few in number they presented Allegheny with an untenable decision to "either change [its] business practices immediately or stand exposed to the imposition of substantial liability." Dkt. 48, 13. In Allegheny's view, this threat made the NOI more akin to letters charging patent infringement, a basis upon which courts have exercised personal jurisdiction. <u>See</u> <u>Inamed Corp. v. Kuzmak</u>, 249 F.3d 1356, 1361-1362 (1st Cir. 2001) (exercising personal jurisdiction over a foreign defendant who not only sent the plaintiff a patent infringement letter, but who also negotiated four patents with the plaintiff and to whom the plaintiff paid annual royalty payments for six years); <u>Nova Biomedical Corp. v.</u>

Moller, 629 F.2d 190, 197 (1st Cir. 1980) (holding that sending threatening patent infringement letters "can, in certain circumstances, constitute the transaction of business within the meaning of Massachusetts' long arm statute" but that "[w]hether a patentee is thereafter subject to jurisdiction will depend on whether he possesses sufficient contacts with the forum to satisfy due process.").

Notably, however, in Inamed Corp. and Nova Biomedical the letters threatening patent infringement, standing alone, were insufficient to support the exercise of personal jurisdiction over the defendant. Indeed, the court in Nova Biomedical stated as much explicitly: "We do not hold here . . . that 'sending threatening infringement letters into the forum district suffices to succumb to that district's jurisdiction.'" 629 F.2d at 196, (quoting Cascade Corp. V. Hiab-Foco AB, 200 U.S.P.Q. 594, 595 (D.Or. 1977)). Thus, whether standing alone or when viewed in the context of the four New York settlement meetings, the 1999 and 2004 NOIs do not rise to the level of minimum contacts specified in either Inamed Corp. or Nova Biomedical.

Allegheny further argues that the NOIs should be considered higher quality, and therefore constitutionally sufficient, contacts because they caused "immediate commercial consequences." Dkt. 48,

**MEMORANDUM OPINION AND ORDER GRANTING THE
DEFENDANTS' MOTION TO DISMISS**

13. Allegheny's complaint, however, pleads no such consequences, nor does it offer proof of actual economic losses; instead, it relies on two public relations actions it took on its own following receipt of the 2004 NOI. Allegheny's own activities, however, "cannot satisfy the requirement of contact with the forum State" for the nonresident defendant, and therefore are irrelevant to a determination of the sufficiency of the AGs' contacts with West Virginia. Hanson v. Denckla, 357 U.S. 235, 253 (1958).

### c. **The CAA Citizen Suit Venue Provision**

Finally, Allegheny argues that the CAA citizen suit provision requires that any suit challenging activities at plants in West Virginia be brought in the district in which those plants are located, that is, in the Northern District of West Virginia. While the AGs initially disputed this assertion, recent decisions have confirmed that the venue provision of 42 U.S.C. § 7604(c)(1) applies to citizen suits brought under 42 U.S.C. § 7604(a)(3). See, e.g., New York v. American Elec. Power Service Corp., Civil Action No. 2:04CV1098, 2006 WL 840390, at *11 (S.D. Oh. May 29, 2006). Because the AGs indicated they intended to challenge activities at Allegheny's West Virginia plants under § 7604(a)(3), § 7604(c)(1) requires them to assert their West Virginia claims "only in the

judicial district in which such source is located" - the Northern
District of West Virginia.  42 U.S.C. § 7604(c)(1).

At bottom, however, it is irrelevant where the AGs would have
brought their CAA citizen suit because they never did so. While
personal jurisdiction questions in contract disputes may be settled
by querying where the parties intended the contract to take place,
this is not a contract dispute. Burger King Corp. v. Rudzewicz, 471
U.S. 462, 479 (1985) (considering, in minimum contacts analysis,
the foreign defendant's contract with plaintiff "that envisioned
continuing and wide-reaching contacts with [the plaintiff].").
Notably, after sending Allegheny the NOIs, the AGs were under no
obligation to follow a particular course of litigation. In fact,
following their 2004 NOI, which threatened action under
§ 7604(a)(3), the AGs had four options. First, they could have sued
Allegheny in Pennsylvania for alleged violations at its
Pennsylvania plants. Or, they could have sued Allegheny in West
Virginia for alleged violations at its West Virginia plants. They
also could have sued Allegheny in either West Virginia or
Pennsylvania for alleged violations in both states had Allegheny
consented to the venue. See American Elec. Power Service Corp.,
2006 WL 840390 at *11. Finally, they could have chosen not to sue
Allegheny at all. Given the uncertainty as to whether the AGs

actually would sue Allegheny in West Virginia, the mere potential of litigation does not render the NOIs of sufficient quality to overcome their sparse quantity.

"Considering the limited contacts between [the AGs] and [West Virginia], to require [the AGs] to defend [their] interest in that state would 'offend traditional notions of fair play and substantial justice.'" <u>Carefirst</u>, 334 F.3d at 402 (quoting <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). Evidence of the actual contacts the AGs had with West Virginia is limited to two letters sent to Allegheny over a period of five years citing alleged CAA violations at West Virginia and Pennsylvania plants, and a series of meetings with Allegheny in New York. From these few contacts, Allegheny cannot show that the AGs purposefully availed themselves of the privilege of conducting activities in West Virginia and therefore fails to establish a prima facie case of specific jurisdiction.

## 2. Analysis of the remaining <u>Carefirst</u> elements is unnecessary.

Because it has concluded that Allegheny cannot establish that the AGs purposefully availed themselves of the privilege of conducting activities in West Virginia, the Court need not analyze the remaining <u>Carefirst</u> elements. <u>See</u> <u>Carefirst</u>, 334 F.3d at 397

(holding that a defendant is subject to specific jurisdiction only if each element of the specific jurisdiction analysis is met).

### IV. <u>CONCLUSION</u>

For the reasons discussed, the AGs are not subject to specific jurisdiction in West Virginia and the Court **GRANTS** their motion to dismiss (dkt. 41), and **DISMISSES** this case **WITHOUT PREJUDICE.**

It is so **ORDERED.**

The Court **DIRECTS** the Clerk to prepare a separate judgment order pursuant to Fed.R.Civ.P. 58(a), and to transmit copies of both orders to counsel of record.

DATED: August 12, 2010.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE